**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** <br><br> vs. <br><br> **RONALD E. LIDDERDALE,** <br><br> Defendant. | Case No. 2:25-mj-270 <br><br> Magistrate Judge Kimberly A. Jolson |

**OPINION & ORDER**

This matter came before the Court on the United States of America's ("the Government") request to detain Defendant Ronald Lidderdale pending trial. (Doc. 10 (oral motion)). The Court held two hearings on the Government's request. (Docs. 16, 29, 32, 33).

After considering counsel's arguments, a report from Pretrial Services recommending release, and a forensic psychological evaluation of Mr. Lidderdale, the Court finds that there are conditions of release that will reasonably assure the safety of other persons and the community. As a result, the Court **DENIES** the Government's request for pretrial detention, as memorialized in this Opinion and Order.

**I.     PROCEDURAL HISTORY**

On May 8, 2025, after a ten-month investigation into the conduct underlying this case, the Government arrested and charged Mr. Ronald Lidderdale by criminal complaint with four counts: (1) interstate communications with a threat to kidnap or injure, in violation of 18 U.S.C. § 875(c); (2) mailing threatening communications, in violation of 18 U.S.C. § 876; (3) false information and hoaxes, in violation of 18 U.S.C. § 1038(a)(1); and cyberstalking, in violation of 18 U.S.C. § 2261A(2). (Doc. 1 (criminal complaint)). The Court held an initial appearance the next day and appointed the Federal Public Defender's Office to represent Mr. Lidderdale. (Docs. 7, 9). Pretrial

Services recommended that Mr. Lidderdale be released and found that a combination of conditions would reasonably assure his reappearance and the safety of other persons and the community. (Doc. 15). Specifically, Pretrial Services recommended releasing him on GPS monitoring with a curfew, along with other restrictions on his ability to access weapons, use narcotic substances, or access the internet. (*Id.* at 3–4).

The Court held an initial detention hearing on May 14, 2025. (Doc. 16). During that hearing, the Government moved for detention based on risk of dangerousness alone. It argued extensively that the nature and circumstances underlying the alleged offenses warrant pretrial detention. (*See* Docs. 16-1–16-12 (Government's detention hearing exhibits); Doc. 32, 27:40–33:04, 39:00–46:44 (Government's argument at the initial detention hearing)). Mr. Lidderdale's counsel, however, proposed additional conditions that could be added to Pretrial Services' recommendations to assuage the Government's concerns, such as home detention, mental health treatment, and further restrictions on his usage of electronic devices. (Doc. 32, 33:10–38:54 (defense counsel's argument at the initial detention hearing)).

In the end, the Court concluded that it needed more information. Specifically, the Court found that the Government's detention hearing exhibits and Mr. Lidderdale's statements to law enforcement suggested underlying mental health concerns. (Doc. 32, 46:44–50:44). The Pretrial Services report, however, recommended no conditions related to mental health. (Doc. 15 at 3–4). Nor did it suggest that Mr. Lidderdale had undergone mental health treatment in the past. (*Id.*). As a result, the Court left the record open and ordered Mr. Lidderdale to undergo a mental health assessment. (Doc. 16).

On June 4, 2025, Dr. Meredith Veltri, Ph.D, ABPP, evaluated Mr. Lidderdale at defense counsel's request. (Doc. 27). Counsel filed Dr. Veltri's forensic psychological evaluation on June

18, 2025, under seal. (*Id.*). After reviewing the evaluation, the Court contacted the Government's and Mr. Lidderdale's counsel with proposed conditions of release. The Government objected to release on those conditions, so the Court set a continued detention hearing for July 7, 2025. (Doc. 28).

At that hearing, Mr. Lidderdale was not present, but the Court proceeded with arguments with counsel's consent. (Doc. 33). For its part, the Government argued that the mental health evaluation changed little and that no combination of conditions could reasonably assure the safety of the community and other persons. (*Id.* at 2:33–4:14). Ultimately, the Court disagreed but imposed conditions beyond those recommended by Pretrial Services to address the Government's concerns:

- GPS Monitoring and Home Detention:  The Court ordered that Mr. Lidderdale would be subject to GPS monitoring and be placed on home detention at his mother's residence. The Court further ordered that he may leave the home only for meetings with his attorney, mental health and medical treatment, and other appropriate appointments, as pre-approved by Pretrial Services.
- Mental Health Treatment:  The Court stayed Mr. Lidderdale's release until July 16, 2025. On that day, after being outfitted with GPS monitoring equipment by Pretrial Services, Mr. Lidderdale must attend an intake appointment and mental health assessment at Alvis, Inc. The next day, he must attend a psychiatric evaluation. The Court ordered Mr. Lidderdale to follow through with all mental health treatment recommended by Pretrial Services and Alvis, Inc. The Court further ordered Pretrial Services to provide weekly updates to the Court on Mr. Lidderdale's mental health treatment.
- Electronic Devices:  The Court ordered Mr. Lidderdale to have no use of computers, cell phones, or other devices that could connect to the internet. The Court also ordered that the only device that could remain in Mr. Lidderdale's residence is his mother's personal cell phone. Additionally, the Court stated that any devices used by other residents in the home shall be approved by Pretrial Services, password protected by a third-party custodian approved by Pretrial Services, and subject to inspection for compliance by Pretrial Services.
- Passport:  The Court ordered Mr. Lidderdale to surrender his passport to the Clerk of Court prior to his release. Additionally, the Court prohibited him from obtaining any new passport or international travel document during the pendency of this case.
- No Contact Order:  The Court ordered Mr. Lidderdale to avoid all contact, directly or indirectly, with any person who is or may become a victim or potential witness in the investigation or prosecution.

3

- <u>No Weapons:</u>  The Court ordered that Mr. Lidderdale may not possess a firearm, destructive device, or other dangerous weapon.  As for any firearms in the home, the Court ordered that they must be removed, and Mr. Lidderdale must verify that fact to Pretrial Services.
- <u>No Substance Use:</u>  The Court prohibited Mr. Lidderdale from using or unlawfully possessing a narcotic drug or other controlled substance defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.
- <u>Substance Use Testing and Treatment:</u>  The Court ordered that Mr. Lidderdale is subject to testing for prohibited substances, as required by Pretrial Services.  The Court also ordered him to follow through with any substance use counseling or treatment recommended by the Pretrial Services Officer.

(*Compare* Doc. 30 *with* Doc. 15 at 3–4).

The Court did not immediately issue an order memorializing this decision.  Instead, because Mr. Lidderdale was not in attendance, the Court provided counsel with a preliminary order setting forth his conditions of release for him to sign.  (Doc. 29 at 1 (ordering Mr. Lidderdale to sign the release order)).  On July 8, the Court docketed a copy of that order signed by Mr. Lidderdale's counsel on his behalf.  (Doc. 30 at 5).

Now, the Court issues this Opinion and Order, memorializing Mr. Lidderdale's conditions of release and the Court's July 7 decision.

## II.  STANDARD UNDER THE BAIL REFORM ACT

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 729, 755 (1987).  Indeed, "[t]he default position of the law . . . is that a defendant should be released pending trial."  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  For that reason, the Bail Reform Act, 18 U.S.C. § 3142, requires the Court to release a defendant unless "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).

The Government bears the burden of showing no such set of conditions exists. *Stone*, 608 F.3d at 946. In determining whether the Government has met this bar, the Court considers a variety of factors:

> (1) the nature and circumstances of the offense charged[;]
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including –
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g)(1)–(4).

While the Court may consider hearsay and evidence offered by proffer, the Government must prove "the risk of dangerousness by clear and convincing evidence." *United States v. Dillard*, No. 3:23-mj-00011, 2023 WL 313856, at *1 (S.D. Ohio Jan. 19, 2023) (citing *Stone*, 608 F.3d at 945). Any "doubts regarding the proprietary of release should be resolved in the defendant's favor." *United States v. Barnett*, 986 F.Supp. 385, 392 (W.D. La 1997) (collecting cases). "This is particularly true in cases where no statutory presumption against release exists." *Id*.

If the Court finds release is required, it "must impose the least restrictive condition or combination of conditions necessary to reasonably" assure the defendant's reappearance and the community's safety. *United States v. Hutchins*, 298 F. Supp. 3d 1205, 1206 (E.D. Wis. 2017).

### III. DISCUSSION

Up front, the Court notes that no presumption in favor of pretrial detention applies here. *See, e.g.*, *United States v. Middleton*, No. 24-cr-40036, 2024 WL 5246595, at *1, 4 (S.D. Ill. Dec. 30, 2024) (clarifying that no presumption of detention applies to charges brought under 18 U.S.C. § 875(c)); *United States v. Drake*, No. 5:22-cr-00008, 2023 WL 213917, at *1–2 (W.D. Va. Jan. 12, 2023) (saying, in a case where a defendant was charged under 18 U.S.C. § 876, 18 U.S.C. § 2261(A)(2), and other statutes, that only one of the charges brought under 18 U.S.C. § 844(i) carried a presumption of detention). And, as noted, Pretrial Services has recommended release in this case. (Doc. 15).

Still, at both detention hearings, the Government argued that Mr. Lidderdale should be detained based upon a risk of dangerous. (Doc. 32 at 27:40–33:04, 39:00–46:44; Doc. 33 at 2:33–4:14). As a result, the Government must show by clear and convincing evidence that no condition or combination of conditions can reasonably assure the safety of the community or any other person if Mr. Lidderdale is released pending trial. *Stone*, 608 F.3d at 945. The Court finds the Government has not met its burden, and the conditions set forth above are sufficient to keep the community safe. The Court reviews each Section 3142 factor in turn.

#### A. Nature and Circumstances of the Offense

The Court first considers the nature and circumstances of the offenses charged, "including whether the offense is a crime of violence." 18 U.S.C. 3142(g)(1). As the Court stated at both detention hearings, the conduct alleged in this case is certainly concerning and violent. *See, e.g.*, *United States v. Choudhry*, 941 F.Supp.2d 347, 351 (E.D. N.Y. 2013) (finding that the nature and circumstances of a communicated threat of violence, charged under 18 U.S.C. § 875(c), constituted

6

a crime of violence); *United States v. Pietila*, No. 1:23-cr-78, 2023 WL 4313162, at *1–2 (W.D. Mich. July 2, 2023) (same) (collecting cases).

As alleged, over the course of nearly ten months, Mr. Lidderdale terrorized various Ohio government officials and their families. (Doc. 1-1 at ¶ 6). He allegedly mailed nearly 50 letters to these individuals, some of which contained a white powder referred to in the letters as "Ricin." (*Id.* at ¶¶ 8–11, 13, 14, 16, 28; Doc. 16-4; Doc. 16-5). Another letter contained a bullet with the recipient's name carved into it, while others contained a list of individuals the writer intended to kill. (Doc. 1-1 at ¶¶ 16, 22; Doc. 16-5; Doc. 16-8). Beyond the letters, Mr. Lidderdale allegedly sent threatening electronic communications to public officials, usually through Proton Mail email addresses to maintain anonymity. (Doc. 1-1 at ¶¶ 7, 15, 28; *see, e.g.*, Doc. 16-3; Doc. 16-6; Doc. 16-7). As the Court stated at the detention hearing, the alleged victims in this case were terrorized for several months, as Mr. Lidderdale apparently maintained his anonymity and escalated his threats.

Yet, as the Government conceded at the initial detention hearing, Mr. Lidderdale's alleged conduct never crossed the line from mail and emails to physical violence or in-person contact. Although Mr. Lidderdale legally possessed some ammunition (Doc. 16-10 at 3, 15); two firearms (*id.* at 6–7); gloves, boots, pants, and a holster that the Government referred to as "tactical gear" (*id.* at 8, 9, 13); and lockpicking equipment (*id.* at 12), the Government presented no evidence suggesting that Mr. Lidderdale had concrete plans to use these materials against the alleged victims. (Doc. 32 at 30:23–32:36). Nor did the Government present any evidence suggesting that Mr. Lidderdale went to the alleged victims' homes or offices. (*Id.*). What's more, the white powder mailed to the alleged victims was not "Ricin" or another toxic substance at all. It was baking soda.

7

Even without such evidence of further violence, the Court still finds the allegations troubling and violent enough to move the needle. This factor weighs in favor of pretrial detention. But other factors matter, too.

**B.     Weight of the Evidence**

At both hearings, the Government highlighted evidence that, in its view, proves Mr. Lidderdale's guilt. In considering this factor, the Court must focus on "the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948. Without a doubt, Mr. Lidderdale's alleged conduct was harmful and threatening. Importantly, however, it appears that he has lost all the tools that allowed him to carry out these alleged offenses.

To start, the terror posed by Mr. Lidderdale's alleged communications stemmed from his anonymity. Neither the alleged victims nor law enforcement knew who he was. Nor did they know whether he actually planned on hurting anyone or had the means of doing so. Anonymity allowed him to pervade the alleged victims' daily lives, as they waited to see if another communication would arrive or if he would carry out the threats. This anonymity was the source of Mr. Lidderdale's alleged power (Doc. 32 at 41:30–41:40), and it was the means through which he continued this conduct for ten months. But now, he has lost that anonymity completely. As the Court stated at the initial detention hearing, no similar communication can be sent without the Government, Pretrial Services, the Court, and the alleged victims knowing exactly who the writer is.

Even so, the Government argues Mr. Lidderdale can easily resume this conduct. As support, the Government notes that Mr. Lidderdale carried out these acts while living at home with his mother—the home where he would reside upon release. Yet there is one major difference: Mr. Lidderdale's mother is now aware of his alleged conduct. She works from home and can monitor

8

his activities closely. What's more, Pretrial Services can carefully track him through GPS monitoring and home detention.

Mr. Lidderdale also lacks supplies to send more threats. Law enforcement seized the materials allegedly used to carry out these offenses, including Mr. Lidderdale's electronic devices, mailing supplies, firearms, ammunition, and supposed "tactical gear." (Doc. 16-10). In addition, the Court has prohibited him from using any electronic devices and ordered that the only electronic device that may remain in the home is his mother's personal cell phone. That cell phone must be password-protected and monitored by Pretrial Services as well. Not only do these conditions remove Mr. Lidderdale's previous tools, but they prevent him from obtaining new materials to resume the harmful conduct.

Other aspects also suggest that Mr. Lidderdale is not as dangerous as the Government contends. For one, he has no history of violence toward others. (Doc. 15 at 3). For another, Mr. Lidderdale initiated contact and cooperated with law enforcement. On May 1, 2025, he allegedly contacted the FBI, albeit anonymously, and reiterated his threats against the alleged victims. (Doc. 1-1 at ¶ 25). He continued to exchange emails with the FBI over several days. (*Id.* at ¶¶ 25–26). Then, on May 8, he called the FBI and agreed to meet with them in Columbus, Ohio. (*Id.* at ¶ 26). At that meeting, he provided a lengthy statement and "admitted to many characteristics of the crime." (*Id.* at ¶ 27). He also led law enforcement to evidence allegedly used in these offenses. (*Id.*). After his arrest, Mr. Lidderdale participated in a mental health evaluation and agreed to undergo mental health treatment. None of these events show an intent to commit future dangerous acts. In fact, they show a desire for rehabilitation, rather than reoffending. *See, e.g.*, *United States v. Spivak*, 555 F.Supp.3d 541, 548 (N.D. Ohio 2021) (saying a lack of violent, criminal history and the seizure of firearms by others lowered the weight of evidence of dangerousness); *United States*

*v. Miller*, 683 F.Supp.3d 641, 644 (E.D. Mich. 2023) (saying cooperation with law enforcement and willingness to engage in substance use treatment shows a lower likelihood of reoffending).

Finally, the Government expressed concern that Mr. Lidderdale's alleged conduct stemmed from many stimuli. As some examples, the Government highlighted his remarks on politics, his finances, his father, and other current events. Because his conduct cannot be narrowed to a single cause, the Government asserts no condition can prevent him from acting violently in the future. But upon his release, Mr. Lidderdale immediately will begin mental health treatment at Alvis, Inc. The purpose of this treatment is to help Mr. Lidderdale identify and address stressors in his life. Notably, the Court has ordered Pretrial Services to provide the Court with weekly updates on his mental health treatment to provide an additional layer of monitoring in this area.

In sum, although the conduct alleged in this case is very troubling, Mr. Lidderdale has lost the tools he allegedly used to terrorize his victims. His mother, Pretrial Services, and the Court can monitor his conduct and location moving forward. He initiated contact with law enforcement and cooperated with them once he did so. Law enforcement seized the materials he allegedly used to carry out these offenses. And Mr. Lidderdale will undergo mental health treatment to address the causes of his alleged conduct. Therefore, although the conduct alleged here is concerning, the Court finds that this factor falls in favor of release.

### C. Mr. Lidderdale's History and Characteristics

Mr. Lidderdale's history and characteristics also weigh strongly against pretrial detention. He has no criminal history whatsoever. (Doc. 15 at 3). Although the Government noted a potential incident with a previous employer, no criminal charges were ever brought, and Mr. Lidderdale confessed and arranged a payment plan. (*See, e.g.*, Doc. 16-10 at 25–27 (letters found in Mr.

Lidderdale's home about this incident)). This aligns with Mr. Lidderdale's cooperation with law enforcement in this case.

He also has a strong support system. He has lived in Columbus with his mother for 10 years and has resided at their current address for five years. He has the support of his mother, who works from their home, as well as his sister. Both family members attended hearings in this case to support Mr. Lidderdale.

In addition, Mr. Lidderdale has no substantial history of alcohol or substance use and reported only occasional use to Pretrial Services. (Doc. 15 at 2). Further, he is educated, has a bachelor's degree, and was employed full-time until his arrest. (*Id.* at 1–2).

Still, one issue stood out at the detention hearings. As the Court highlighted, several of Mr. Lidderdale's statements to law enforcement read as a cry for help. (Doc. 32 at 47:40–47:54). For instance, prior to his arrest, Mr. Lidderdale allegedly expressed the following to law enforcement:

- He wrote that his "urge to act has hit a boiling point," but his morals prevented him from carrying out his violent threats. (Doc. 16-11 at 2).
- Many times, he expressed a profound respect for law enforcement and first responders and even apologized to the FBI for his actions. (*Id.*; Doc. 16-12 at 1).
- Mr. Lidderdale explained that he "was never a violent person," but "everything that has happened for the past year, both in [his] personal life as well as what remains of [the] country . . . led [him] to this point." (Doc. 16-12).
- He said his mother "knew nothing" about his conduct, and said that while it would be difficult for him when she found out, "that [was] a sacrifice [he felt he] must endure." (Doc. 16-12 at 1).
- Mr. Lidderdale expressed mounting fear and frustration from current events and his finances. (Doc. 16-12).
- He also stated that he didn't want "to go down a path [he] can't walk back from" or to carry out his violent threats. (*Id.*). After that, he suggested he wanted to continue discussing his conduct with the FBI. (*Id.*).

These statements show a person struggling with his emotions, as well as a person who is both remorseful and looking for a way to end the alleged conduct. In addition to these statements,

11

Mr. Lidderdale expressed overwhelming feelings of depression, anxiety, and frustration to Pretrial Services and Dr. Veltri. (Doc. 27 at 1–2; Doc. 15 at 1–2). He also described lingering distress stemming from his father's emotional and physical abuse. (Doc. 27 at 1–2). And, once again, Mr. Lidderdale seemingly expressed remorse and affirmed that he never wanted to physically harm the alleged victims. (*Id.* at 4). Dr. Veltri diagnosed him with depressive disorder and recommended both therapy and a psychiatric evaluation, which Pretrial Services has already arranged. (*Id.*).

On the whole, the Court finds that Mr. Lidderdale's history and characteristics, along with his need for and desire to engage in mental health treatment, weigh in favor of release.

### D. Nature and Seriousness of Danger Posed to the Community

As noted, the conduct alleged in this case is serious and alarming. The Court does not minimize the danger posed by the alleged conduct. Nonetheless, Mr. Lidderdale has lost all the tools that allowed him to carry out these acts. What's more, his history and characteristics weigh in favor of release. At bottom, the Court finds the conditions contained in this Order are enough to reasonably assure the safety of others and the community and to address the Government's concerns. Again, the Court briefly addresses each point raised by the Government, along with related conditions the Court has imposed for those issues.

First, the Government highlighted that Mr. Lidderdale was able to carry out these offenses while living at the same residence to which he will return. As discussed above, Mr. Lidderdale now will be subject to home detention and GPS monitoring by Pretrial Services. This means he will not be able to leave the home except for appointments pre-approved by his supervising officer. Simply put, he will not be able to visit the post office, library, or other locations to access the internet or mail threatening communications. Further, now that his mother is aware of his alleged conduct, she can monitor him more carefully, especially since she works from home. Mr.

Lidderdale will not have access to electronic devices, and his mother's cell phone will be password-protected and subject to monitoring by Pretrial Services. These conditions are enough to reasonably assure the Court that Mr. Lidderdale will not be able to access the internet, create new email addresses, or send threatening communications via the mail.

Still, the Government believes that Mr. Lidderdale can overcome any monitoring or internet restrictions to continue the alleged conduct. This concern, however, is largely speculative, and the Government did not offer any specific ways in which Mr. Lidderdale could circumvent Pretrial Services' monitoring capabilities or the Court's restrictions on his movement and access to electronic devices. Still more, law enforcement seized the equipment Mr. Lidderdale allegedly used to send these threats, including his computers, printers, and cell phones. (Doc. 16-10 at 1, 18, 22, 29, 31). And because of the GPS monitoring and home detention conditions imposed, he cannot leave his residence or access the internet to replace those supplies.

Next, the Court has ordered Mr. Lidderdale to participate in mental health counseling and stayed his release to ensure he begins treatment the very day he is released. As represented by Pretrial Services, his treatment will include weekly mental health counseling and medication, as recommended by Alvis, Inc. This treatment will give Mr. Lidderdale the opportunity to address various stressors in his life, including the alleged causes of the conduct underlying this action. This, too, will address the Government's concern that Mr. Lidderdale could be triggered by various stimuli upon his release. Plus, the Court will receive weekly updates from Pretrial Services on his treatment to ensure Mr. Lidderdale does not pose a danger to others.

In addition to these conditions, the Court has ordered Mr. Lidderdale not to have contact, either directly or indirectly, with any alleged victims or potential witnesses in this case. Further, law enforcement seized the two firearms in the home, and the Court has ordered that he may not

purchase or obtain any other dangerous weapons during the pendency of this case. These conditions, too, reduce the risk of future danger to the alleged victims and other persons in the community.

***

At bottom, the Government has not shown by clear and convincing evidence that these conditions are not enough to reasonably assure the community's safety. Again, the Court reiterates that the conduct alleged in this case is serious and troubling. Today, it is not the Court's role to punish Mr. Lidderdale or incarcerate him as a means of deterring others from performing similar acts. Instead, the Court's only role is to determine if any condition or combination of conditions can reasonably assure the public's safety if he is released. The Court finds such conditions exist.

As such, the Court **ORDERS** that Mr. Lidderdale be released subject to the conditions laid out in Section I of this Order. That release shall be **STAYED** until **July 16, 2025**, the day of Mr. Lidderdale's mental health assessment at Alvis, Inc.

### IV. CONCLUSION

The Court **DENIES** the Government's request for pretrial detention (Doc. 10), as memorialized in this Opinion and Order.

IT IS SO ORDERED.

Date: July 10, 2025            /s/ Kimberly A. Jolson
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE